Ruffin, C. J„
 

 In 1828 William White died, having made his last will and bequeathed to his wife, for life, the residue of his estate, with remainder to his four children, Joshua, Peggy, Solomon and William the younger, and he appointed Mrs. White and another to execute his will. The widow proved it; and with a sum of money belonging to the estate she purchased in 1824 three slaves and took a bill of sale to herself. This bill was filed in 1839 against Mrs. White, Joshua, Peggy and Solomon, by William the son and by Pettijohn, who claims as assignee of Solomon, and it charges that Mrs. White made the purchase as executrix and trustee, and for the benefit of her children as well as herself: that the negroes have increased to ten, and that the widow has disposed of five of them, without the assent of the remainder-men, and threatens to dispose of the others for her own purposes, and to send them out of the State and beyond the reach of those entitled in remainder. The prayer is for an injunction against the removal of the slaves, and for a sequestration, until security be given for the production of the negroes at the death of Mrs. White and to abide the decree in the cause.
 

 The defendants answered. The material answer is that of Mrs. White, which denies that she purchased, as executrix or trustee, and exhibits the bill of sale to herself; and it avers that she purchased for herself exclusively, and hath always claimed and treated the negroes as her own. It admits that the money, with which she purchased, was a part of her husband’s estate, but states that the interest of her children therein is not at all in jeopardy, and that she is well able to pay to them, at her death, the whole principal money, and insists that they are entitled to no more, and that the slaves belong to her. An injunction and sequestration were granted on
 
 *443
 
 the bill; and on the coming in of the answers and on the tion of Mrs. White, the sequestration was discharged and injunction dissolved; his Honor declaring his opinion that Mrs. White was the absolute owner of the slaves. From that decree the plaintiffs were allowed an appeal.
 

 The appeal, being from an interlocutory order, presents for the consideration of this court but the isolated point decided by his Honor. In disposing of that, it is also to be taken, that Mrs. White did not expressly, nor did she intend to purchase, as executrix; but intended to become the owner of the slaves in her own right. Supposing that to be so, the.argument for the plaintiffs is, that the money invested in the slaves was a trust fund, in the hands of Mrs. White, as executrix, for the benefit of herself and her children, and, therefore, that the original trust, to which the fund was subject, attaches to the slaves, in which it has been invested, which are tó be substituted for the money. The principle, we admit, is a sound one in morals and in the law of this court, that an executor or other trustee cannot convert one species of property into another, to the prejudice of the
 
 cestui que trust,
 
 nor to make a gain to himself. He cannot use the trustfund for his private profit; but, although he must bear the losses, the legatee or other
 
 cestui que trust
 
 has an absolute right to charge the trustee with interest on the money used, or at his election, to adopt the purchase and take the thing, in which the money has been invested, with all the profits.
 
 Burdett
 
 v.
 
 Willett, 2
 
 Vern. 638.
 
 Chadworth
 
 v.
 
 Edwards,
 
 8 Ves. 46.
 
 Ryall
 
 v.
 
 Ryall,
 
 Ambl. 413.
 
 Newton
 
 v.
 
 Bennett,
 
 1 Bro. Ch. Ca. 361.
 
 Treves v. Townshend,
 
 1 Bro. Ch. Ca. 384.— But that principle does not appear to us to reach the case before us. The doctrine has no other foundation than this, that the person, who, as
 
 cestui que trust
 
 of the original fund, claims the property, in which it has been invested, was, in the view of the Court of Equity, the owner of the fund, and, therefore, entitled to the profits of it, as well as the capital. For that reason, it does not seem to apply here. If the testator had directed the money to be laid out in slaves, for the use of his wife for life, and afterwards to go to his children, then, certainly, the plaintiff’s claim could not be controverted.
 
 *444
 
 go, if the legacy had been of slaves for life and then over, and they had been exchanged for other slaves, or sold and their proceeds re-invested in slaves, by the tenant for life, ihere would be more strength in
 
 the plaintiff’s
 
 demand: such a claim to substitution — to a greater extent, at least, than charging the last slaves as a security for the value or price got for the first. — was deemed doubtful in
 
 Clark
 
 v.
 
 Ray,
 
 1 Dev. & Bat. Eq. 443. But there are weighty considerations for a chancellor’s inferring every thing against a tenant for life of slaves-^-at least of female slaves. — .who sells them. The act tends so manifestly to the loss of the remainder-man, who is legally entitled to the issue born during the life estate, that it seems almost an inevitable conclusion, that the tenant for life converted the original stock into another, either honestly, for the benefit of all concerned, or dishonestly, to increase the profits of the life estate at the expense of the ulterior estate; and in either case, there is much room for insisting on the equity, that- a change of form shall not diminish the interest of the remainder-man, and that he may claim either the first or the last stock of slaves, at his election. If a legatee for life be not willing to raise negroes for the remainder-man, he ought not to accept the legacy. When, therefore, the question shall come distinctly before the court, in due time and in a proper case, whether the remainder-man of slaves ought not to have that election, we shall be well inclined to listen favorably to the argument for the remainder-man, and so to regulate the relief, as far as we can find ourselves sustained by authority or principle, as to give to the remainder-man the full benefit of the bounty to him, and take from the tenant for life all inducement to dispose of the subject of the legacy improperly.
 

 But the present is not a case' like those we have been considering. The subject is a sum of money; and it is not left in the hands of the executrix to be invested for the benefit, merely, of others. But during her life she is herself to have it, and, after her death, it is to go over. The remainder-men have, therefore, the capital only given to them, and all the profits during her life'belong to the executrix herself. All, therefore, that the remainder-men can justly ask, is, that, at
 
 *445
 
 thedeath of the tenant for life, the principal money be paid to them. They may, indeed, in case the money be in jeopardy from the insolvency of the executor or person having the fund, or from its being improperly invested, ask also to have it so secured, that it may be forthcoming at the proper time; and, if need be, that it be declared a charge on any estate, in which it may have been invested. But this bill is not framed with any such view. On the contrary, it claims the slaves themselves, as the equitable property of the remainder-men of the money, with which they were purchased; and seeks to have their delivery specifically, at the death of Mrs. White, decreed. Such a property, we think, the remainder-men have not. We do not find a case to give color to the claim. It is well known that the increase of slaves is a substantial part of their profit. Now, the profit of the purchase ought to go to the person to whom the profit of the money belonged, with which the purchase was made; and this upon the principle of the rule, on which the plaintiffs build their claim. They say, the negroes are theirs, because they were bought with their money. Then they are only theirs as far as
 
 their
 
 money goes; which is to the extent of the principal sum at the death of Mrs. White. If they had stated that they could not get that, except out of these negroes and had asked that they should be declared a security for the capital, there would have been but little hesitation in grantingthe prayer. But it would be extremely unjust to the mother, to allow the remainder-men to lie by for fifteen years, when the negroes have grown in value from four or five hundred dollars to as many thousands, and then insist upon having the purchased slaves and all their increase; which, in effect, would be to get all the profits of the legacy given to the wife. As the plaintiffs have no right whatever in those profits during Mrs. White’s life, they- cannot engraft on the property in the slaves their right in remainder to the money invested in them; because that would be to give them much more than the money, and for an act of the tenant for life, which was not intended to injure and has not injured the remainder-men, but was done for the lawful and fair purpose of increasing the profits, to which she was entitled.
 

 
 *446
 

 We
 
 must therefore declare that we see no error in the decree made in the Court of Equity, and direct it to be so certified to that court. The appellants must pay the costs in this court.
 

 Per Curiam, Ordered Accordingly.